IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **M & B Solutions, LLC,** an Illinois Limited Liability Company**,** | |
| Plaintiff, | |
| v. | No.: Judge Courtroom # |
| **Erie Insurance Company**, a Pennsylvania Insurance Company, | |
| Defendant. | Magistrate Judge Courtroom # |

## COMPLAINT AT LAW

NOW COMES the Plaintiff, M & B Solutions, LLC, by and through its attorneys, Ekl, Williams & Provenzale LLC, and complaining of the Defendant, Erie Insurance Company, a Pennsylvania Insurance Company, upon information and belief, state as follows:

### Introduction

1.      This is a breach of contract and statutory bad faith suit by the Plaintiff, M & B Solutions, LLC (hereinafter "M & B"), against the Defendant, Erie Insurance Company, a Pennsylvania Insurance Company, seeking damages and statutory penalties under Illinois law brought herein on grounds of Diversity for Erie's breaching and bad faith conduct in connection with its investigation, adjustment and partial denial of a first-party property insurance loss claim that M & B filed with Erie pursuant to a Policy of Business Property Coverage Insurance after the insured roof

1

system and related roof improvements and equipment at M & B's warehouse in Bolingbrook, Illinois, sustained widespread and severe direct physical damage in a hail and wind storm on February 27, 2024.

**The Parties, Jurisdiction and Venue**

2.     The Plaintiff, M & B Solutions, LLC, is a duly licensed Illinois limited liability company with its offices and principal place of business in Bolingbrook, County of Will, State of Illinois, whose members are all citizens of the State of Illinois, and owning and operating a parcel of commercial property located at 456 W Crossroads Parkway, Village of Bolingbrook, County of Will, State of Illinois, improved by a building structure with fixtures and improvements thereon.

3.     At all times relevant hereto, the Defendant, Erie Insurance Company (hereinafter "Erie"), was a foreign insurance company duly licensed and chartered under the laws of the State of Pennsylvania and licensed by the Illinois Department of Insurance to underwrite and issue policies of insurance, including policies insuring property against damage by fire or other casualty, and doing such business in the County of Will, State of Illinois.

4.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332(a), as the parties are citizens of different states, and the amount in controversy, exclusive of interest and costs, is in excess of $75,000.00.  Furthermore, venue is appropriate in this district pursuant to 28 U.S.C §1391(b)(2) as the loss event, the property and a substantial part of the events and transactions giving rise to this suit are and/or occurred in this District.

### The Property and the Policy

5.     At all times relevant hereto, M & B owned a large and active transportation / trucking warehouse and distribution facility located at 456 W Crossroads Parkway in Bolingbrook, Illinois.  This is a large, rectangular warehouse with a flat roof of approximately 100,000 square feet (sf).  The roofing system is built of a substrate of a low-density / low compression strength insulation board, with a single ½" layer of high-density cover board, all covered by panels, heat-welded together at the seams, of a singly-ply layer of thermoplastic polyolefin (TPO), which layer is mechanically fastened to the substrate below.  There are 20 skylights across the roof, and the perimeter of the roof is built-up parapet walls.  The TPO is flashed up the vertical face of the skylight frames and parapet walls and under metal flashings of the skylight frames and across the top of the walls.  This roofing system (hereinafter "TPO membrane") was installed between 2013 and 2015.  Multiple roof vents and stacks are covered in metal caps / vents, and there are 18 HVAC rooftop units on the roof.  TPO membrane flat roofs like this are generally accepted in among roofing industry professionals to have functional lifespans of 25 to 30 years.  Hereinafter, the above is collectively referred to as "the insured building."

6.     Effective January 14, 2024, Erie renewed a policy of insurance for M & B, effective through January 14, 2025 (hereinafter "the Policy"), under Policy #: Q61 0254653.  A complete copy of this Policy is attached hereto as Exhibit A.  Relevant hereto, this policy included a specific coverage form part called the "ErieSecure Business Property Coverage Part," as well as the "Illinois Property Change

Endorsement" and the "Windstorm or Hail – Deductible" Endorsement (hereinafter collectively "the Property Coverage Provisions").

7.     Under the Policy generally and the Property Coverage Provisions specifically, the insured building was the specifically listed covered property and insured location for the Property Coverage Provisions. **Exhibit A**, at ERIESECURE BUSINESS PROPERTY COVERAGE PART, SECTION I – COVERAGES, BUILDINGS – COVERAGE 1. A. Covered Property.

8.     Pursuant to the Policy and the Property Coverage Provisions, Erie promised M&B that "We will pay for direct physical 'loss' of or damage to covered property at the premises . . . caused by or resulting from a peril insured against." **Id.**, at INSURING AGREEMENT (at p.1). Erie's Policy does not define the word "damage," but defines the work "loss" as "direct and accidental loss of or damage to covered property. **Exhibit A**, at SECTION IX - DEFINITIONS, at p.47.

9.     Erie also specifically promised that perils it insured against under the Policy were both wind and hail, stating "We will pay the amount of 'loss' or damage to [the insured building] which is in excess of the deductible shown in the 'Declarations' for windstorm or hail." **Exhibit A**, at WINDSTORM OR HAIL – DEDUCTIBLE Endorsement. Moreover, Erie promised in that same Endorsement that "If 'loss' or damage from a covered weather condition other than windstorm or hail occurs, and that 'loss' or damage would not have occurred but for the windstorm or hail, such "loss" or damage shall be considered to be caused by windstorm or hail and therefore part of the windstorm or hail occurrence." **Id**.

4

10.     Under the Policy and Property Coverage Provisions in effect from January 14, 2024, through January 14, 2025, Erie promised M & B that Erie would pay for direct and accidental physical loss or damage to the insured building caused by wind and/or hail, up to the limits of insurance of $13,562,000, less a $50,000 deductible, or up to $13,512,000. **Id.**, at Policy Declarations, p.3, *and* ERIESECURE BUSINESS PROPERTY COVERAGE PART, SECTION I – COVERAGES, BUILDINGS – COVERAGE 1. C. **Amount of Insurance**.

### Facts Common to All Counts of the Complaint

11.     On February 27, 2024, a powerful hail and windstorm blew through the southwest Chicagoland area, including specifically Bolingbrook, Illinois, and the location of M & B's insured building.

12.     The wind and hail was significant. Within a 2-mile radius, hailstones exceeding 2" in diameter were recorded as falling in large quantity. In the same area, maximum wind speeds of 40mph were also recorded.

13.     This storm event was so severe and widespread in the area that it has been known among insurers, including Erie, as a catastrophic loss event due to the number of property damage hail claims made by property owners across the Chicagoland area.

14.     The insured building was not spared from the wrath of this storm. In fact, the 100,000sf roof sustained widespread and multiple forceful hail impacts, as well as damage due to wind-blown debris.

15.     The nature of the direct physical damage was severe.  In multiple locations across the entire roof of the insured building, the force of the hailstone impacts fractured / perforated the TPO membrane, dented the roof metal caps and TPO and metal flashings, dented rooftop HVAC units, and blew holes through a sign. At far more locations across the roof, hail impacts left impressions and dimples in the TPO membrane that permanently altered the pre-loss physical condition of the membrane.  At other locations, windblown debris tore into and across the TPO membrane.

16.     Examples of the direct hail damage that caused perforation / punctures to the TPO membrane are shown here:



17.     Examples of direct hail damage to the metal caps, flashing and HVAC units, and signs are shown here:



18.     Examples of the widespread hail damage in the form of impressions and dimples in the TPO membrane are shown here (the last picture of which demonstrates the volume and clustering of these impacts):



19.     Examples of the direct damage to the TPO membrane due to windblown debris, with an eagle-view diagram, are shown here:



20.     On July 1, 2024, M & B filed its first notice of claim for this hail and wind damage with Erie for benefits to which it was contractually entitled under the Policy directly caused by the hail and wind damage as noted above.

21.     Instead of promptly addressing and resolving the claim through a good faith investigation of the hail and wind damage for what was known industry-wide to be a catastrophic loss event, Erie hired an engineering firm to conduct an inspection of the insured building's roof as if it was expecting to need some extraordinarily sophisticated expertise to identify hail damage to the roof.

22.     This decision was curious, to say the least. This was a catastrophic storm event in the area, known by Erie from numerous other claims it handled for this event to have produced damaging hail. Moreover, during the first inspection of the loss by Erie's claims adjuster on August 20, 2024, Erie's adjuster noted numerous areas of hail and wind damage across the TPO roof (as documented by example, above). Most confusingly otherwise, Erie was also in possession of an engineering

report from a different engineer's inspection performed on June 12, 2020, before this storm event, that established with some recency to the date of loss here that there was no known hail or wind damage to the roof membrane of the insured building pre-loss.

23.     In other words, at the time that Erie decided it needed a professional engineer to weigh in, Erie knew this was an actual catastrophic hail and wind event, knew from prior report that there was no documented pre-loss hail damage to the TPO membrane on the insured building, and knew from its own adjuster's inspection that there was documented hail damage to the insured building after the storm.

24.     At the time, it was objectively unreasonable, measured against generally accepted standards and practices of the first-party property claims industry and also measured against Erie's obligations under the Policy and Illinois law, to retain a professional engineer to tell Erie the obvious – that the roofing system and roof metals (including RTUs) on the insured building sustained widespread direct damage due to hail and wind from the storm.

25.     I fact, Erie's intent in pursuing this unreasonable course, retaining this engineer to inspect the loss that Erie knew from a recent engineer's inspection had no documented pre-loss hail damage, following a known catastrophic storm event, and that its own adjuster saw, was not to find what it expected to find or confirm what was obvious, but rather to manufacture excuses to avoid having to meet its contractual loss payment obligations under the Policy.

26.    In fact, instead of conducting an industry compliant inspection and investigation, and belying the true purpose, Erie's engineer pursued a course of action that can charitably only be characterized as a "head-in-sand."

27.    First, Erie's engineer only conducted a close inspection of a single 10' x 10' area of the 100,000sf TPO roof. This area of inspection (representing one-tenth of one percent of the roof area) is grossly and unreasonably inadequate as if an inspection that is representative of the presence of hail damage across the entire 100,00sf of this TPO roof. Generally accepted standards and practices of the roofing and loss claims industries call for reasonable inspectors to perform a 100sf test square inspection per 5,000sf – 10,000sf of effected roof area. In other words, an industry compliant inspection using a test squares method for inspection of wind and hail damage to the roof at the insured premises required 10 to 20 individual 10' test squares, not one. Instead, Erie's engineer looked at one-tenth of one percent of the roof area from which it extrapolated assumptions about the condition of the rest of the roof.

28.    Second, despite acknowledging hail impacts across the roof not only to the metals (vent caps, flashing, RTUs), but also to the TPO membrane, Erie's contracted engineer minimized the scope of the damage by only focusing on and addressing in his "conclusions" 8 documented fractures (full-depth perforation / penetrations) of the TPO membrane, asserting that they could be repaired with "TPO patching."

29.    This "conclusion" is obviously outside of the engineer's area of expertise, particularly where the engineer's opinion as to how something may be repaired makes no reference to generally accepted standards, customs and practices of the roofing industry, and as importantly here, particularly where the engineer makes no reference to a term of the Policy or the Property Coverage Provisions justifying a patch 8 fractures, while ignoring the fact of accidental direct physical damage from hail strikes across the rest of the roof.

30.    In fact, here, Erie's engineer omitted mentioning anywhere in his report to Erie the generally accepted and recognized effects / consequences of hail impacts to a TPO roof among roofing industry and first-party insurance claims professionals, even where the impacts do not result in clear fracture / penetration through the membrane.

31.    Specifically, roofing industry professionals, including materials manufacturers, installers and consultants (hereinafter collectively "roofing professionals"), generally agree and recognize that hail impacts to TPO roofs by hail in excess of 1.5" in diameter cause damage to a TPO membrane, sometimes referred to as dents or "bruising," that diminishes the performance and durability of the membrane.

32.    For example, hail strikes, especially to a mechanically fastened single-ply TPO membrane like installed across the roof of the insured premises, are known and expected to result in compression of the TPO material, called "bruising" or "thinning" at the impact site on the membrane, which leads to premature cracks over

time and diminution of the lifespan of the membrane. Additionally, this "bruising" or "thinning" also diminishes and impairs the integrity of the membrane from protecting the roof from later hail strikes in later hailstorms, which itself again diminishes the functional lifespan of the membrane to protect the building from the elements.

33.     Around October 16, 2024, the engineer delivered its deficient and obviously flawed report to Erie. As one of the nation's largest property insurers of commercial and residential properties, Erie actually knew all of the above deficiencies and flaws in the engineer's report and conclusions but intentionally ignored what it knew to unreasonably rely on a facially narrow and deficient engineers report.

34.     Still, even upon receipt of the engineer's report in October, Erie refused to share it with M & B and, by this time, its retained public adjuster.

35.     Despite repeated entreaties from M & B's public adjuster to share the engineering report, and provide a status on the loss claim – a claim that was obviously and patently one on which Erie's liability was reasonably clear to Erie on first inspection on August 20, 2024, Erie sat on the report and the claim and gave M & B and its public adjuster no report as to what it was going to do, even to the point that B & B, through its public adjuster, formally demanded in January 2025, 4 months after the engineer's inspection, to Erie that it reassign the claim to a different adjuster.

36.     Finally, around January 15, 2025, Erie communicated its loss decision to M & B and its public adjuster – it extended coverage for the loss, but only estimated

the damages at $951.39 total, for a zero payment after application of the $50,000 deductible.

37.    This amount, and the delay associated with Erie communicating this amount, on a claim on which liability was reasonably clear since August of 2024, was patently unreasonable.  Moreover, the amount, and the related delays, were patently and unreasonably insufficient in light of the substantial and indisputable hail and wind damages across the insured building.

38.    Even then, in delivering this unreasonable loss decision, Erie refused to share its engineer's report, and M & B and its public adjuster had no idea on what information, or why, Erie was ignoring all the damage and not paying what it owed.

39.    On January 28, 2025, in light of Erie's unreasonably insufficient and delayed loss decision with zero payment, M & B, through its public adjuster, communicated its estimate to repair and replace the hail and wind damages covered under the policy, as documented by examples set forth hereinabove, in the total amount of $2,402,900.51, which included full replacement of the hail damaged TPO membrane and code compliances for substrates, as well as overhead and profit for a general contractor as this repair and replacement job is going to require, given the fact that this is a large roof, requiring replacement of HVAC units, all for a building housing an active trucking and warehouse operation.

40.    Erie's response to M & B's loss estimate was not to share its engineer's report from September's inspection, but rather to go back for more inspections, this time to have an HVAC professional inspect the RTUs, and a thermographer to test

for moisture trapped under the TPO membrane, which inspections were scheduled and completed in February and March of 2025.

41.     By this point, in early April of 2025, it had been 8 months since Erie knew that its liability to pay M & B for covered damages under the Policy was reasonably clear, yet Erie had not paid M & B a penny to repair and replace the obvious, severe and widespread covered damages.

42.     Moreover, Erie's decision to pursue moisture testing was pointless. Whether moisture was trapped under the TPO membrane or not had no relevance to whether the TPO membrane suffered direct physical damage due to hail.  The only question that would answer is whether the hail punctured holes through which water was penetrating, but the Policy does not just pay for hail caused holes, it pays for accidental direct physical damage due to hail, which was caused all across this roof from the storm.

43.     Regardless, M & B permitted Erie to conduct these follow-up inspections, on the belief that Erie would meet its obligations under the Policy, and was conducting these additional inspections, even if far too late and apparently pointlessly, in good faith to do so.

44.     M & B soon regretted the decision.  On April 10, 2025, after 8 months of additional unnecessary and unreasonably delayed inspections (that should have been done, even if reasonable, far earlier) Erie delivered a new loss decision – with no written explanation or reasoning.  Erie sent M & B and its public adjuster the engineer's October 16, 2024, report, the HVAC inspector's February 24, 2024, report,

and the thermographer's moisture inspection report, and a loss estimate that reflected that Erie agreed to pay M & B $95,921.15 for the hail and wind damages, less the $50,000 for the deductible and $41,612.98 for depreciation, **for a net actual cash value payment of $4,308.17**.

45.     Examination of the itemization of its payment estimate reveals that Erie was only agreeing to belatedly pay for the obvious hail damage to the HCAV units (17 of the 18 RTUs were hail damaged, 5 needing to be replaced entirely, 12 needing to be repaired according to Erie's own HVAC inspector), and to patch the 8 holes in the TPO membrane caused by hail impacts.

46.     Erie was plainly denying M & B's claim for full roof replacement due to the widespread hail and wind-blown debris damage to the TPO membrane, as well as for the damage to the metals, but Erie was not providing M & B any explanation, much less a reasonable written one, as the reason for the denial.  All Erie provided by way of explanation was in relation to what it was paying for – the patching of the 8 holes in the TPO membrane caused by hail – and even then, only explaining "per Engineer's report".

47.     Again, and as outlined above, the engineer's report of October 16, 2024 (that Erie did not give to M & B and its public adjuster until April 10, 2025), does not explain why patching 8 hail strike punctures is compliant with generally accepted standards and practices of the roofing industry just for that damage (or how that meets Erie's obligations under the Policy to pay for the damages), much less how an engineer has expertise to say either of those things.  Moreover, the report and

conclusions otherwise does not explain how patching 8 puncture locations constitutes industry compliant or Policy basis for Erie's refusal to pay M & B for accidental direct physical hail damage to all the other areas of the TPO membrane for hail impact compression / bruising / thinning, accidental direct physical hail damage to the roof metals, or accidental direct physical damage to the TPO membrane from wind-blown debris.

48.    Worse, apart from refusing to provide M & B any explanation for its refusal and denial to pay what M & B claimed Erie owed for this loss, Erie was knowingly acting unreasonable in relying on the engineering report of October 16, 2024, and the moisture study report of March 20, 2025.  As alleged above, Erie knew that the engineer's October 16, 2024, report, was not reliable, and knew that the moisture report was irrelevant as to whether the TPO membrane sustained accidental direct physical hail damage or wind-blown debris damage, or whether the metals on the roof were likewise damaged by hail.

49.    Erie's above conduct violates Illinois law.  First, Erie's above conduct constituted an unfair claims practice in violation of 215 ILCS 5/154.6(d), in that Erie did not attempt in good faith to effectuate a prompt, fair and equitable settlement of M & B's claim once liability became reasonably clear, waiting 8 months from when its own inspection in August 2024 confirmed the presence of hail damage from the February 27, 2024, storm to the TPO membrane, RTUs and roof metals, and even then unreasonably relying on a methodologically inadequate, factually unsupported, and improperly narrow engineer's report, and an irrelevant moisture report.

15

50.    Second, Erie's above conduct violated Illinois law at 50 Ill.Admin.C. 919.50(a)(1) in that Erie's communications with M & B failed to provide M & B with a "reasonable written explanation of the basis of the lower offer or denial within 30 days after the investigation and determination of liability is completed. This explanation shall clearly set forth the policy definition, limitation, exclusion or condition upon which denial was based."

51.    Notwithstanding, M & B, through its public adjuster, engaged in repeated efforts over the following months to explain to and convince Erie why M & B's loss estimate was required to be paid as necessary to achieve workmanlike manner repairs, including by submitting to Erie a hold harmless agreement for Erie to sign for the roofing contractor to be protected from liability if Erie refuses to pay for replacement of the TPO membrane, as opposed to patching.

52.    Instead of engaging with M & B and its authorized public adjuster and roofing contractor, to either promptly review and respond in writing, or to identify a contractor whom would make and warrant the patching repairs only in light of all the other damages, Erie ignored M & B and the public adjuster's efforts to explain why the necessary repairs for the hail and wind damages exceed Erie's written estimate of April 21, 2025.

53.    This conduct violated 50 Ill.Admin.C. 919.80(d)(7)(C), because not only did Erie refuse to respond to M & B and its public adjuster in writing, it failed to provide written notice to M & B that any and all reasonable costs incurred for repair

or replacement related to the partial loss in excess of the company's estimate will be reimbursed by the company.

54.     Finally, on December 12, 2025, after M & B submitted a sworn proof of loss[1] for the claim under the provisions of the Policy with an updated loss replacement cost estimate of December 2, 2025, in the amount of $2,513,577.29 (ACV of $2,356,352.91 after reductions for $50,0000 deductible and $107,224.38 recoverable depreciation), Erie for the first time asserted in writing that "Patching will bring the roof to its pre-loss condition." In this writing, Erie intentionally ignored all of the infirmities and inadequacies of the engineer's report it claimed to be relying on, despite actually knowing all of them. Erie's reliance on the Engineer's report and conclusions for the conclusion that Erie drew from it was facially unreasonable under the circumstances, as outlined in the above allegations.

55.     Erie also stated to M & B for the first time in writing on December 2, 2025, that the moisture study of March 20, 2025, actually revealed 8 locations of trapped moisture under the TPO membrane in spots unrelated to the 8 hail-caused punctures it paid to patch as covered. Erie also acknowledged in this same writing that these 8 wet areas, not associated with the previously identified hail strikes, also revealed the existence of 8 more fractures / penetrations in the TPO membrane that explained the trapped moisture than were previously identified by the engineer in its

---

[1] It should be noted that Erie summarily denied this sworn proof of loss claiming that it was not in proper form as required by the Policy. Then, Erie claimed that it could not email M & B or its PA the correct form. Interestingly, the Policy doesn't mention that Erie's email system cannot email a form. Regardless, the form never came in the mail until early February of 2026 – 60 days after it was requested!

September 2024 inspection (a not surprising result given the inadequacy of its sampling methodology). However, Erie then claimed in writing that the engineer characterized these 8 newly discovered impact punctures / penetrations as "not caused by hail."

56.     This factual representation is facially false and unreasonable. Simple review of the punctures / penetrations in these 8 additional locations, identified with the assistance of the moisture study, are plainly and obviously caused by hail. Moreover, neither the engineer nor the thermographer ever characterized or attributed a cause of these punctures much less said they were not caused by hail.

57.     The above factual misrepresentation of relevant facts relating to the coverage at issue was done knowingly by Erie, as alleged above, and constituted an unfair claims practice in violation of 215 ILCS 5/154.6(a).

58.     On February 11, 2026, M & B re-submitted its sworn proof of loss as alleged in par. 52, above. Erie has not paid M & B the amount of loss it has claimed, in the replacement cost amount of $2,513,577.29 (ACV of $2,356,352.91 after reductions for $50,0000 deductible and $107,224.38 recoverable depreciation), for a net payment

59.     M & B has been unable to contract and perform the necessary repairs and replacement related to the covered damages because Erie has unlawfully and in breach of its obligations under Illinois law and the Policy withheld payment of reasonable and necessary loss amounts for workmanlike and roofing industry complaint repair and replacement of the covered damages to the insured building.

18

60.     M & B has been and is in full compliance with all of its obligations under the Policy.

## COUNT I – BREACH OF CONTRACT

61.     Plaintiff realleges and incorporates ¶¶5 through 60, above, as if fully set forth herein.

62.     Defendant has made loss payment in the amount of $4,308.17, which is in breach its obligations to Plaintiff under the Policy.

63.     Plaintiff has suffered actual and consequential damages caused by Defendant's breach in the amount of $2,513,577.29 (ACV of $2,356,352.91 after reductions for $50,0000 deductible and $107,224.38 recoverable depreciation).

WHEREFORE, the Plaintiff, M & B Solutions, LLC, demands judgment against the Defendant, Erie Insurance Company, in an amount in excess of $75,000, plus prejudgment interest, plus the costs of this suit.

## COUNT II – INSURER BAD FAITH

64.     Plaintiff realleges and incorporates ¶¶5 through 60, above, as if fully set forth herein.

65.     Defendant has acted intentionally, vexatiously and unreasonably, both in light of generally accepted standards and practices in the first-party property insurance claims industry, as well as in light of its obligations and under Illinois statutory and regulatory law, in one or more of the following ways:

     a. Committed an Improper Claims practice, in that it failed to attempt a prompt, fair and equitable settlement of Plaintiff's claims;

b. Committed an Improper Claims practice, in that it knowingly misrepresented to Plaintiff relevant facts relating to the coverages at issue to avoid paying Plaintiff what it owed;

c. Committed an Improper Claims practice, in that it failed in the case of the denial of a claim or the offer of a compromise settlement to promptly provide a reasonable and accurate explanation of the basis in the insurance policy or applicable law for such denial or compromise settlement;

d. Failed to provide written notice to M & B that any and all reasonable costs incurred for repair or replacement related to the partial loss in excess of the company's estimate will be reimbursed by the company;

e. Failed to provide Plaintiff a reasonable written explanation of the basis of the lower offer or denial within 30 days after the investigation and determination of liability was completed, clearly setting forth the policy definition, limitation, exclusion or condition upon which denial or lower offer was based;

f. Forced the Plaintiff to have to sue Defendant in order to compel Defendant's compliance with its plain obligations and for Plaintiff to recover what it was owed; and

g. Was otherwise vexatious and unreasonable.

66.     As a direct and proximate result of one or more of the aforementioned acts and/or omissions of the Defendant, the Plaintiff suffered damage to his person, property, rights and privileges, being personal, contractual and financial.

67.     That on account of efforts to enforce his rights, the Plaintiff has and will continue to incur attorney's fees and costs.  In addition, the Plaintiff is entitled to recover against the Defendant an amount in statutory penalty, as applicable to the bad faith conduct, of either 60% of the amount that a jury awards of that amount in excess of the Defendant's actual cash value payment, or $60,000, whichever is greater, pursuant to 215 ILCS 5/155(1).

WHEREFORE, the Plaintiff, M & B Solutions, LLC, demands judgment against the Defendant, Erie Insurance Company, in an amount in excess of $75,000, plus statutory penalties for its incurred attorney's fees and costs, plus the greater of the statutory penalty pursuant to 215 ILCS 5/155(1), as appropriate under the circumstances, plus prejudgment interest, plus the costs of this suit.

*Plaintiff demands trial by jury on all issues so triable.*

Respectfully submitted by,
 s/   Patrick L. Provenzale
Ekl, Williams & Provenzale LLC
*Attorneys for Plaintiff*

Patrick L.  Provenzale
Ekl, Williams & Provenzale LLC
[ **#6225879** ]
Two Arboretum Lakes
901 Warrenville Road, Suite 175
Lisle, IL 60532
(630) 654-9975
(630) 654-8318 *Facsimile*
pprovenzale@eklwilliams.com